

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**RAHEEM S. AL-AZIM**, *et al.*,

       Plaintiffs,

v.                                      Civil Action No. **3:14CV339**

**J. EVERETT**, *et al.*,

       Defendants.

**MEMORANDUM OPINION**

Raheem S. Al-Azim, Charles X, and Victor X ("Plaintiffs"), Virginia inmates proceeding

*pro se*, have submitted this civil action. The matter is proceeding on the Plaintiffs' Amended

Complaint (ECF No. 36). By Memorandum Opinion and Order entered on August 3, 2015, the

Court dismissed a number of the Plaintiffs' claims. *See Al-Azim v. Everett*, No. 14cv339, 2015

WL 4634456, at * 7–8 (E.D. Va. Aug. 3, 2015). The following claims are still before the Court:

Claim 1       (a ) "Defendants Clarke, . . . Hobbs, . . . and Washington violated [Victor X's and Al-Azim's] First Amendment[1] right to practice their religion by refusing to provide them a diet reasonably consistent with *How to Eat to Live*, Volumes 1 and 2, by the Most Honorable Elijah Muhammad." (Am. Compl. 1.)[2]
                  (b) Defendants Clarke, Hobbs, and Washington violated Victor X's and Al-Azim's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA")[3] by failing to provide a diet consistent with *How to Eat to Live*. (*Id.* at 10.)

---

    [1] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

    [2] Harold Clarke is the Director of the Virginia Department of Corrections ("VDOC"). Wendy S. Hobbs is a Regional Administrator for the VDOC. V.M. Washington is a former Regional Administrator for the VDOC. The Court corrects the capitalization, spelling, and punctuation in the quotations from Plaintiffs' submissions.

    [3] Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, 42 U.S.C. §§ 2000cc *et seq.*

Claim 2        "Defendant[] Clarke . . . violated [Victor X's] rights under the Fourteenth
               Amendment[4] by refusing to provide [him] a diet reasonably consistent with *How
               To Eat To Live*, while affording one to members of the Nation of Islam confined
               at Buckingham Correctional Center, thereby intentionally discriminating against
               [Victor X] on the basis of [his] religion." (*Id.* at 5.)

Claim 3        (a) "Defendant[s] Washington, Puryear, and Hobbs violated [Charles X's] right to
               practice [his] religion by refusing [him] sufficient time for worship services." (*Id.*
               at 6.)[5]
               (b) Defendants Washington, Puryear, and Hobbs violated Plaintiffs' rights under
               RLUIPA by refusing: (i) "to afford Plaintiffs time to have [Fruit of Islam] F.O.I.
               training classes for two (2) hours weekly"; (ii) "refusing to afford Plaintiffs time
               to have Juma'ah (Friday) prayer service for one (1) hour"; and (iii) "refusing to
               afford Plaintiffs time to have Self-Improvement: The Basis for Community
               Development classes for two (2) hours weekly." (*Id.* at 10).

Claim 4        "Defendants Washington, Robinson, Clarke, and Hobbs violated [Charles X's and
               Victor X's] right to practice their religion by refusing to authorize them to
               purchase and receive compact discs of weekly sermons by the Honorable Louis
               Farrakhan." (*Id.* at 7.)[6]

        The August 3, 2015 Order further directed that any party wishing to file a motion for

summary judgment must do so within seventy (70) days of the date of entry thereof. Defendants

filed a Motion for an Extension of Time, which the Court granted, and Defendants timely filed

their Motion for Summary Judgment on December 8, 2015.

        The Court granted Plaintiffs' Motion for an Extension of Time to respond to Defendants'

Motion for Summary Judgment. On February 26, 2016, Plaintiffs filed their Response to

Defendants' Motion for Summary Judgment and then filed their own Plaintiffs' Motion for

Summary Judgment. As Plaintiffs' Motion for Summary Judgment was filed well past the

---

[4] "No State shall . . . deny to any person within its jurisdiction the equal protection of the
laws." U.S. Const. amend. XIV, § 1.

[5] Timothy Puryear is a former Programs Manager for the Greensville Correctional Center
("GCC").

[6] A.D. Robinson is Chief of Operations for the VDOC.

2

deadline set in the August 3, 2015 Order, Plaintiffs' Motion for Summary Judgment (ECF No. 54) will be DENIED as untimely filed. For the reasons set forth below, Defendants' Motion for Summary Judgment (ECF No. 47) will be GRANTED IN PART AND DENIED IN PART. Claims 2(a), 2(b), 3, and 4 will be DISMISSED.

## I. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "'[T]here is a

3

preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed.'" *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants have submitted, *inter alia*, the affidavit of Curtis Wall, a chaplain at GCC (Mem. Supp. Mot. Summ. J. Ex. 1 ("Wall Aff.," ECF No. 48-1)), the affidavit of A. David Robinson (*id.* Ex. 2 ("Robinson Aff.," ECF No. 48-2)), and the affidavit of Elisabeth M. Thornton, the VDOC Operations Administrator (*id.* Ex. 3, ("Thornton Aff.," ECF No. 48-3)). In response, Plaintiffs have submitted, *inter alia*, the Declaration of Victor X ("Victor Decl.," ECF No. 56), the Declaration of Johnathan Lee X ("X Decl.," ECF No. 58), the Declaration of Willie X, ("Willie Decl.," ECF No. 60), and the Declaration of Charles X ("Charles Decl." ECF No. 61). Additionally, Plaintiffs swore to the contents of the Amended Complaint under penalty of perjury.[7]

At this stage, the Court is tasked with assessing whether Plaintiffs have "proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). Thus, the facts offered by affidavit must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). In this regard, the statement in the affidavit or sworn statement "must be made on personal knowledge . . . and show that the affiant or declarant is competent to testify on

---

[7] The Court omits the emphasis in the quotations from Plaintiffs' submissions.

the matters stated." Fed. R. Civ. P. 56(c)(4). Furthermore, summary judgment affidavits must "set out facts." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Apps. & Serv. Co.,* 80 F.3d 954, 962 (4th Cir. 1996) (internal citation omitted) (citing *Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 975 (4th Cir. 1990); *Md. Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1252 (4th Cir. 1991)). The absence of an "affirmative showing of personal knowledge of specific facts" prevents the consideration of such facts in conducting the summary judgment analysis. *EEOC v. Clay Printing Co.,* 955 F.2d 936, 945 n.9 (4th Cir. 1992) (citation omitted) (internal quotation marks omitted).

As an initial matter, Plaintiffs raise a number of objections to Defendants' submissions. First, Plaintiffs contend that the commission for the notary who endorsed Robinson's affidavit expired prior to the notary endorsing Robinson's Affidavit. This is simply not accurate. The notary's commission expires on April 30, 2019. (Robinson Aff. 4.) Accordingly, Plaintiffs' objection to Robinson's Affidavit will be OVERRULED. Plaintiffs' Motion to Strike Robinson's Affidavit (ECF No. 59) will be DENIED.

Next, Plaintiffs contend that the Court should not consider Thornton's Affidavit because, *inter alia,* she fails to demonstrate that she is competent to testify as to food costs and the burdens of various diets. As the VDOC Operations Administrator, Thornton is competent to testify to the matters set forth in her affidavit and Plaintiffs fail to demonstrate that her Affidavit should not be considered because she failed to attach additional records to her Affidavit. Plaintiffs' objections to Thornton's Affidavit will be OVERRULED.

In light of the foregoing submissions and principles, the following facts are established for purposes of the Motion for Summary Judgment.

5

## II. Pertinent Facts

"Plaintiffs are sincere students and followers of the Most Honorable Elijah Muhammad under the leadership of the Honorable Minister Louis Farrakhan, the National Representative of the Most Honorable Elijah Muhammad and the Nation of Islam" (Am. Compl. ¶ 3.)  Plaintiffs believe their religion commands them to obey Elijah Muhammad and Louis Farrakhan.  (Victor Decl. ¶ 9.)

### A. Facts Pertaining to Claims 1 and 2

#### 1. NOI Dietary Requirements

Elijah Muhammad outlined the dietary requirements for members of the NOI in *How to Eat to Live*.  (Am. Compl. ¶ 1.)  "*How To Eat To Live* requires Plaintiffs to train themselves to consume only one meal every twenty-four (24) hours -- with no in between snacks or brunches -- consisting of food approved by *How To Eat To Live*."  (*Id.* ¶ 4.)  According to Plaintiffs, *How to Eat to Live* requires that they eat:

> properly baked whole wheat bread and properly cooked navy (pea) beans, cabbage (without the green leaves), carrots, spinach, beets, lettuce (without its green leaves), browned rice, rutabaga, asparagus, broccoli, eggplant, white corn (in its milky stage), onion, olives, garlic, rhubarb, cauliflower, green pepper, and a limited number of other foods.  These vegetables must be fresh and properly cooked before [being] eaten. These vegetables must be fresh, not canned, and properly cooked before eaten.

(*Id.* ¶ 8.)

Additionally, Plaintiffs insist that they must refrain from "eating meat and all marine life." (*Id.* ¶ 5.)  Plaintiffs represent that the regular menu at GCC contains the following foods which they are prohibited from eating:

> [P]ork meat, food containing its derivatives, beef, **fish**, collar[d] greens, kale salad, peanut butter, **jelly**, corn bread, yellow corn, white rice, oleo, biscuits, freshly baked bread, freshly baked pasteries, processed cheese, white bread, sweet

6

> potatoes, white potatoes, canned (cooked) vegetables, pinto beans, kidney beans, blackeyed peas, cabbage with its green leaves, spaghetti, macaroni, fried food, hard baked food, **egg**, jello, french toast, and pancakes.

(*Id.* ¶ 6 (emphasis added).)  Plaintiffs, however, are not consistent with respect to which foods they are prohibited from eating.  For example, while Plaintiffs insist that their religious diet prohibits them from consuming eggs, they simultaneously complain that the commissary at GCC refuses to sell eggs which are needed for their diet.  (Victor Decl. ¶ 5.)

Plaintiffs further assert that Defendants "can easily accommodate the annual dietary requirements of Plaintiffs by providing the so-called Nation of Islam Month of Fasting Menu that they have composed to enable members of the Nation of Islam . . . to observe our annual Ramadan."  (X Decl. ¶ 4 (citing Encl. A).)  Contrary to Plaintiffs' earlier expressed need for only a single meal a day, the Month of Fasting Menu provides two meals a day and regularly contains food items that Plaintiffs insist they are prohibited from eating such as fish and eggs.  (X Decl. Encl. A, at 1–4.)[8]

Additionally, "*How To Eat To Live* strictly forbids Plaintiffs to consume food that has been prepared or cooked in or with utensils that have been used to prepare, cook, serve, or eat pork or its by-products or other prohibited food."  (Am. Compl. ¶ 9.)

---

(Am. Compl. ¶ 6 (emphasis added).)  Plaintiffs are not consistent with respect to which foods they are prohibited from eating.  For example, while Plaintiffs insist that their religious diet prohibits them from consuming eggs, they simultaneously complain that the commissary at GCC refuses to sell eggs which are needed for their diet.  (Victor Decl. ¶ 5.)

[8] For example, the breakfast menu for one day consists of the following: 1 serving of fruit; ¾ cup of oatmeal, 2 boiled eggs, 2 slices of wheat bread, 8 ounces of milk, and 8 ounces of coffee.  (X Decl. Encl. A, at 1.)  The dinner meal consists of: ½ cup of mackerel; 1 cup of brown rice; ½ cup of green beans; 2 slices of wheat bread; 1 serving of fruit; an 8 ounce beverage; and, 8 ounces of milk.  (*Id.*)

## 2. The Common Fare Diet

"The Virginia Department of Corrections recognizes 28 different religions." (Thornton Aff. ¶ 4.) "Many religions have dietary restrictions." (*Id.*) Differences in opinion exist about these dietary restrictions, even within a given religion. (*Id.*) "These religious dietary restrictions include not only the types of food (e.g. no pork products), but also include the way meat is slaughtered (e.g. halal meat), the way food is stored and cooked (e.g. kosher), how the cooking tools are cleaned (e.g. kosher), and how the food is served (e.g. on trays uncontaminated by non-kosher food)." (*Id.*) Religious diets also may require fasting at certain times, and feasts at other times (e.g. Ramadan, Passover). (*Id.*)

"The VDOC designed the Common Fare [diet] specifically to meet the dietary needs of offenders who, for religious reasons, require a Kosher non-pork diet and whose dietary requirements cannot be accommodated with foods provided by the Master Menu." (*Id.* ¶ 6.) "The VDOC Food Service Manual provides clear guidelines regarding food preparation and service of Common Fare food items. Appropriate procedures are in place to ensure that food service workers, including offender kitchen workers, receive appropriate training and supervision in the proper handling of Common Fare food." (*Id.*) "The Common Fare menu has been analyzed and certified as meeting or exceeding minimum daily nutritional requirements." (*Id.* ¶ 7.) The Islamic leader of the Islamic Center of Virginia advised VDOC officials that the Common Fare diet meets Islamic guidelines. (*Id.*)

The VDOC Food Service Manual provides for separate storage, preparation, cleaning, and service of food, pans, and utensils utilized in the Common Fare meals. (Thornton Aff. Encl. A, at 2–3.) Nevertheless, according to Plaintiffs, the Common Fare diet:

8

is served cafeteria-style from pans of food that are located on the same steam line used to serve the regular menu. The eating utensils (such as sporks, trays, cups) used by the prisoners who receive the Common Fare are also used by prisoners who receive the regular diet, which includes pig eaters. The serving utensils (such as pots and pans, tongs, etc.) cups, sporks, and trays used to eat and serve food to the guys who receive the Common Fare are washed and sanitized in the same sink and water used to wash and sanitize these same utensils used by the regular population, including pig eaters.

(X Decl. ¶ 7.)[9]

The parties, however, fail to direct the Court to admissible evidence regarding what diet the Plaintiffs are eating.[10]

### 3. NOI Diet Served at Buckingham

With respect to the NOI diet provided at Buckingham, Thorton states:

> Prior to implementation of the Common Fare diet, special meals were provided to Nation of Islam inmates at Buckingham Correctional Center in accordance with a court order. Buckingham is not a VDOC facility that offers Common Fare; however there are still two offenders remaining at Buckingham who were "grandfathered" in and continue to receive a Nation of Islam diet with meals provided by an outside vendor. These meals include fish, and the cost is extremely high compared to Common Fare. They average approximately $2.70 per meal, as compared to approximately $1.35 per meal for Common Fare.

(Thornton Aff. ¶ 10.) Plaintiffs insist that the NOI diet at Buckingham is an appropriate diet for their religious requirements. (X Decl. ¶ 4.) Nevertheless, contrary to Plaintiffs' earlier expressed need for only a single meal a day, the Buckingham NOI diet provides three meals a day and regularly contains food items that Plaintiffs insist they are prohibited from eating, such as cole slaw, fish, eggs, and jelly. (Thorton Aff. Encl. B.)

---

[9] X swears that "I can 'personally' see these things take place in the mess hall when I go there to eat." (X Decl. ¶ 7.)

[10] Defendants simply allege in their Answer that Al-Azim and Charles X are currently participating in the Common Fare diet and that Victor X has declined to participate in the Common Fare diet. (Mem. Supp. Mot. Summ. J. ¶ 21 (citing Ans. ¶ 8).)

9

## B. Facts Pertaining to Claim 3

GCC provides space for inmates "to conduct group religious activities." (Wall Aff. ¶ 5.)

"Typically, each recognized faith group at GCC has a worship service of 2 to 2 1/2 hours per

week." (*Id.*) For NOI inmates, GCC provides space on Fridays from 1:30 to 3:30 p.m. in order

to accommodate their need to conduct their Friday Jumah prayer service. (*Id.*) "Jumah is

obligatory for Muslims [and it] must be conducted in a congregation." (*Id.* (punctuation

corrected).) VDOC regulations provide:

> e.  Religious services and group worship shall normally be conducted by an approved spiritual leader or volunteer. If a religious group has no available spiritual leader or volunteer, offenders may meet under the general supervision of trained and authorized staff as approved by the Facility Unit Head.
> f.  No offender shall be recognized by the DOC as a spiritual leader, pastor, rabbi, imam or any other type of clergy.
>> i.  Offenders may be authorized by the Chaplain or other facility staff to lead religious programs, services or study groups. . . .
>> ii. Offender religious leaders should be rotated on a regular basis (if possible) to prevent abuses.

(Willie Decl. Encl. A, at 1.) GCC also provides accommodations "to allow Muslim offenders to

perform their personal, daily, prayers five times a day." (Wall Aff. ¶ 6.) In addition to Friday

Jumah prayer, "the Eid Fitr prayer and the Eid Adha prayer are required group/congregational

prayers and Muslim offenders are allowed to conduct them in a congregation." (*Id.*)

Furthermore,

> Muslim offenders are permitted to observe authorized holy days and seasons. This includes special fasts, dietary regulations, worship and work proscriptions. On approved work proscription days, Muslim offenders are excused from work, school, meetings and all other organized activities. They are allowed to engage in contemplative study and worship, either individually and/or in groups depending on the requirements of the holy day and on other factors such as the availability of space, time and supervision.

(*Id.* ¶ 7.)

According to Plaintiffs, Minister Farrakhan requires his incarcerated followers to

participate in the following religious services:

> a) Juma'ah (Friday) prayer services for one (1) hour weekly,
> b) Fruit of Islam (F.O.I.) training for two (2) hours weekly (This training is for observant members of the Nation of Islam only),
> c) congregate worship service for two (2) hours weekly, and
> d) Self-Improvement: The Basis for Community Development studies for two (2) hours weekly.

(Am. Compl. ¶ 22.)  Plaintiffs complain that they cannot conduct Jumah prayer during the Friday

afternoon period, because they have to conduct a congregation worship service during this

period.  (Willie Decl. ¶ 9.)  Willie X states:

> In the past, I have tried to conduct F.O.I. training, congregate worship service, Jumah (Friday) prayer, and Self Improvement: the Basis for Community Development classes *within* our allotted 2 hours . . . .  However, I had to discontinue this practice upon learning that it violated our basic rule not to take on mixed instruction and because the practice did not allow us sufficient time for any one service.

(Willie Decl. ¶ 13.)

"NOI offenders have been told that they can have more time for religious group activities

if they obtain a religious volunteer.  A religious volunteer is a member of the community who is

recognized by a faith group and who has been approved to conduct specific religious activities

on a volunteer basis." (Wall Aff. ¶ 8.)  Wall and other GCC chaplains have sought "to locate and

secure the services of an Imam and/or other Muslim religious volunteers, but have been

unsuccessful." (*Id.*)  "If a religious volunteer is secured for the NOI offenders, they will be

afforded more time for religious group activities per week." (*Id.* ¶ 9.)[11]

---

[11] Willie X relates that he contacted Minister Reginald Muhammad, who applied to VDOC officials to serve as NOI volunteer. (Willie Decl. ¶ 14.) Willie X states that Minister Muhammad indicated that the VDOC repeatedly ignored Minister Muhammad's requests to

## C. Facts Pertaining to Claim 4

Plaintiffs contend that their religious beliefs require that they "purchase, possess, and study weekly sermons by Minister Farrakhan to acquire a proper knowledge and understanding of the teachings of the Most Honorable Elijah Muhammad and for their continual religious growth and development." (Am. Compl. ¶ 25.) Plaintiffs use these sermons in their NOI training and Self Improvement. (*Id.* ¶ 26.) "Compact discs and cassette tape recordings are the only means by which Plaintiffs can access Minister Farrakhan's weekly sermons." (*Id.* ¶ 27.) Plaintiffs insist that "[o]n his audio recordings, Minister Farrakhan's unique voice and his unique exegeses of the Holy Qur-an, the Holy Bible, and the teachings of the Nation of Islam increase Plaintiffs faith in Allah (God) and in Minister Farrakhan and make Plaintiffs actually feel God's divine presence." (*Id.* ¶ 28.) Although recordings of Minister Farrakhan's sermons can be purchased from The Final Call, Inc., "Defendants refuse to authorize Plaintiffs to use their personal funds to purchase, receive, and possess compact discs or cassette tapes of Minister Farrakhan's weekly sermons, thereby effectively preventing them from having classes for F.O.I. training." (*Id.* ¶ 30.)

Inmates currently cannot purchase CDs of Minister Farrakhan's sermons directly from the Final Call, Inc., because, for security reasons, the VDOC utilizes a single vendor for the sale of CDs, Music by Mail ("MBM"). (Robinson Aff. ¶¶ 5–8, 10.) "Unfortunately, MBM has not been able to work out an arrangement with Final Call publications which would allow Minister Farrakhan's sermons to be sold through MBM." (*Id.* ¶ 9.) Nevertheless, the Chaplain Services with the VDOC

---

serve as a volunteer. (*Id.*; Victor Decl. ¶ 16.) The foregoing statements attributed to Minister Muhammad constitute inadmissible hearsay.

maintains more than forty (40) DVD's of Minister Farrakhan's sermons for review by offenders. Offenders may view them in the Chaplain's library. [Additionally], Minister Farrakhan's sermons [are] available on CD which the offenders must listen to in the Chaplain's library. Offenders may also use these DVDs and CDs in their group religious services.

(Wall Aff. ¶ 10.)

### III. Analysis

#### A.   RLUIPA

RLUIPA provides, in pertinent part, that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—
>    (1) is in furtherance of a compelling governmental interest; and
>    (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Thus, to begin, Plaintiffs must demonstrate that Defendants' policies impose a "substantial burden" on their religious exercise. In determining if Plaintiffs meet this standard, the Court must answer two questions: "(1) Is the burdened activity 'religious exercise,' and if so (2) is the burden 'substantial'?" *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004); *see Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir. 2012) (employing similar two-part inquiry).

RLUIPA fails to define the term substantial burden. *See Couch*, 679 F.3d at 200. The United States Court of Appeals for the Fourth Circuit determined that the Supreme Court's jurisprudence interpreting the Free Exercise Clause provides guidance on the issue. *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). Thus, the Fourth Circuit has explained that a substantial burden

is one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion . . . on the other hand.

13

*Couch*, 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace*, 472 F.3d at 187). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger v. Brown*, 496 F. App'x 322, 325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)).

### B. Religious Diet - Claims 1(a) and 1(b)

Defendants do not dispute that selecting a diet for religious purposes qualifies as a religious exercise. (Mem. Supp. Mot. Summ. 15 (citation omitted).)  Defendants, however, dispute that they have substantially burdened Victor X's or Al-Azim's ability to eat a diet consistent with *How to Eat to Live*.  Quoting a recent opinion by this Court, Defendants contend "Plaintiffs' desire to consume a vegetarian diet is easily accommodated by personal choices from the Common Fare tray by not eating the fish, and [they] can choose from the meal options available to [them] to eat once daily." (*Id.* (quoting *Shabazz v. Johnson*, No. 3:12CV282, 2015 WL 4068590, at *6 (E.D. Va. July 2, 2015)).)  The record in *Shabazz*, however, provided considerably more detail regarding the foods then available on the Common Fare menu. *See Shabazz*, 2015 WL 4068590, at *2–3. Defendants fail to explain, with citation to evidence in the present record, how, by selecting items from the Common Fare menu, Victor X and Al-Azim can consume a diet consistent with *How to Eat to Live.*

Moreover, a material dispute of fact exists as to whether the Common Fare diet accommodates Victor X's and Al-Azim's sincere religious desire to avoid food contaminated by pork.  Although Defendants contend that they have made provisions to keep Common Fare trays free from contamination by pork products, Plaintiffs have adduced evidence that reflects such

14

procedures are not followed.  (X Decl. ¶ 7.)  Accordingly, Defendants are not entitled to summary judgment on Claims 1(a) and 1(b) on their argument that Victor X and Al-Azim fail to demonstrate a substantial burden on their religious exercise.

Next, Defendants assert Claims 1(a) and 1(b) should be dismissed because VDOC dietary policies are in furtherance of a compelling governmental interest and are the least restrictive means of furthering that interest.  In support of this assertion, Defendants rely heavily upon this Court's decision in *Shabazz*, where the Court found that "the Common Fare diet furthers compelling state interests of uniformity, cost-efficiency, and maintaining inmate health, by the least restrictive means." *Shabazz*, 2015 WL 4068590, at \*12.  The record in *Shabazz* reflected that "[t]he Common Fare diet was designed specifically to meet the dietary needs of offenders who, for religious reasons, require a Kosher non-pork diet and whose dietary requirements cannot be accommodated with foods provided by the regular menu." *Id.* at \*2 (citation omitted) (internal quotation marks omitted).  The record in *Shabazz* further reflected that prison official had gone to great lengths to ensure that the Common Fare were not contaminated by pork products. *See, e.g., id.* at \*3 (internal citations and quotation marks omitted) ("The Common Fare diet is not served cafeteria-style like the regular meal.  The Common Fare trays must be pre-made, covered and maintained at a specific temperature.").  In this case, Plaintiffs contend that Defendants fail to employ these readily available methods for ensuring that Common Fare meals are not contaminated by pork.  According to Plaintiffs, the Common Fare diet is served cafeteria-style from pans of food that are located on the same steam line used to serve the regular menu and the utensils and other serving items are often contaminated by pork products.  Given this record, Defendants fail to demonstrate that they are employing the least restrictive means of

15

furthering a compelling governmental interest. Furthermore, on this record, Defendants fail to demonstrate that their current practices with respect to service of the Common Fare is rationally related to a legitimate penological objective. Accordingly, Defendants' Motion for Summary Judgment with respect to Claims 1(a) and 1(b) will be DENIED.[12]

Defendants correctly note that monetary damages are not available under RLUIPA. *Miles v. Moore*, No. 3:10CV162, 2012 WL 4866561, at *1 (E.D. Va. Oct. 12, 2012) (citing *Sossamon v. Texas*, 563 U.S. 277, 280 (2011); *Rendelman v. Rouse*, 569 F.3d 182, 184 (4th Cir. 2009)). Accordingly, the demand for monetary damages in conjunction with Claim 1(b) will be DISMISSED.

## C. Equal Protection

Victor X's equal protection argument regarding inmates who receive a NOI diet in Buckingham Correctional Center is difficult to decipher and logically inconsistent. Victor X contends that he wants to receive the diet that certain NOI inmates receive at Buckingham. However, it is also apparent that the NOI diet provided at Buckingham is also inconsistent with the diet that Victor X insists that his religious beliefs demand.

First, Victor X fails to demonstrate that he is similarly situated to the NOI inmates in Buckingham. The NOI diet at Buckingham Correctional Center includes fish, eggs, and jelly, and provides three meals a day. (Thornton Aff. Encl. B.) Victor X wants a diet that has no fish,

---

[12] Defendants also generally claim entitlement to qualified immunity. Defendants, however, fail to articulate why, considering the evidence as forecast by Plaintiffs, they would be entitled to qualified immunity. *Wall v. Wade*, 741 F.3d 492, 502 (4th Cir. 2014) (holding that under "the Free Exercise Clause . . . a prisoner has a clearly established . . . right to a diet consistent with his . . . religious scruples" (quoting *Lovelace v. Lee*, 472 F.3d 174, 198–99 (4th Cir. 2005))). Accordingly, Defendants' request for qualified immunity will be DENIED WITHOUT PREJUDICE.

eggs, or jelly and provides only one meal a day; thus, it is unclear why he believes these inmates are similar to him. (Am. Compl. ¶ 6.) Moreover, Buckingham is not a Common Fare facility. Instead, two inmates at Buckingham receive a special diet pursuant to an old court order, predating the Common Fare diet, and the inmates are merely grandfathered in to the old diet. Victor X fails to demonstrate that he is similarly situated to the NOI inmates who eat, fish, eggs and jelly at Buckingham. Victor X also fails to demonstrate he is similarly situated to inmates who receive a special diet based on a court order that pre-dates the Common Fare diet. Because Victor X fails to demonstrate that he is similarly situated to inmates in Buckingham, this alone forecloses his equal protection claim.

Even if Victor X could demonstrate that he and a comparator inmate at Buckingham Correctional Center were similarly situated, and that the different treatment was a result of intentional discrimination, his claim nonetheless fails. Defendants have proffered sufficient evidence demonstrating that any differential treatment "is reasonably related to . . . legitimate penological interests." *Veney v. Wyche,* 293 F.3d 726, 732 (4th Cir. 2002) (internal quotation marks omitted) (citation omitted). The NOI diet at Buckingham Correctional Center is costly compared to the Common Fare diet, double the price of the Common Fare diet, and provided by an outside vendor. Defendants have demonstrated that the refusal to provide Victor X with the diet provided to NOI inmates housed at Buckingham Correctional Center, to the extent that Victor X even desires that diet, "is reasonably related to the legitimate penological interests of containing cost, managing scarce prison resources, and efficient food provision." *Shabazz v. Johnson*, No. 3:12CV282, 2015 WL 789200, at *14 (E.D. Va. Feb. 24, 2015) (citing *Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007); *DeHart v. Horn*, 390 F.3d 262, 272 (3d Cir. 2004);

17

*Williams v. Morton*, 343 F.3d 212, 217–18 (3d Cir. 2003); *Cooper v. Lanham*, No. 97-7183, 1998 WL 230913, at *1–2 (4th Cir. May 7, 1998)). Victor X fails to proffer any evidence demonstrating that this penological interest is "so remote as to render the policy arbitrary or irrational." *Wall*, 741 F.3d at 499 (citation omitted) (internal quotations marks omitted). Accordingly, Claim 2 will be DISMISSED.

### D. Group Religious Activities - Claims 3(a) and 3(b)

In Claim 3(b), Plaintiffs insist that their rights under RLUIPA have been violated because they have not been afforded sufficient time to conduct all of their group religious activities. In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger*, 496 F. App'x at 325 (citing *Cutter*, 544 U.S. at 725 n.13). Nevertheless, "at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004));[13] *see Krieger*, 496 F. App'x at 326 (affirming grant of summary judgment where inmate failed to "show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs" (citing *Lovelace*, 472 F.3d at 187)). Thus, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion.

---

[13] In *Sossamon v. Texas*, 563 U.S. 277, 280 (2011), the Supreme Court abrogated *Smith*'s ultimate holding that RLUIPA allows for monetary damages against state officials acting in their official capacity.

*Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Two recent cases from the Fourth Circuit illustrate a plaintiff's responsibility with respect to demonstrating a substantial burden. In *Couch*, the plaintiff "testified that the primary religious texts of Islam command that he grow a beard and that the refusal to maintain a beard is a sin comparable in severity to eating pork." *Couch*, 679 F.3d at 200. The VDOC's grooming policy prohibited inmates from growing beards and enforced this rule by placing a noncompliant inmate in a program that "restricted or limited [the inmate's] access to personal property, movement rights, the right to eat and associate with others, recreation time, and visitation time." *Id.* at 199. The Fourth Circuit concluded that VDOC's grooming policy and enforcement mechanism, "fit squarely within the accepted definition of 'substantial burden'" because it placed substantial pressure on the plaintiff to modify his behavior and violate his beliefs. *Id.* at 200–01 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 995–96 (9th Cir. 2005)).

In *Krieger*, the Fourth Circuit declined to find an inmate had demonstrated a substantial burden where prison officials denied "his requests for an 'outdoor worship circle' and certain 'sacred items' related to his religious practice of Asatru." *Krieger*, 496 F. App'x at 322. The plaintiff "asserted that deprivation of the outdoor worship circle would require him to pray indoors, and that the 'Blot' ceremony is '*best* performed outdoors.'" *Id.* at 325 (emphasis added). The Fourth Circuit concluded that the mere denial of the optimal manner for performing the "Blot" ceremony could not demonstrate a substantial burden where the plaintiff "failed to offer any explanation regarding the reason why indoor worship would compromise his religious beliefs." *Id.* Similarly, the inmate failed to demonstrate a substantial burden with respect to the

19

denial of additional sacred items simply by the "blanket assertion" that "the sacred items were 'necessary' to perform 'well-established rituals.'" *Id.* at 326. The Fourth Circuit noted that plaintiff "did not identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs." *Id.*

*Krieger* illuminates another consideration in conducting the substantial burden inquiry. The availability to an inmate, in the most general sense, of other means to practice his or her faith is not relevant to the RLUIPA substantial burden inquiry. *Al–Amin v. Shear*, 325 F. App'x 190, 193 (4th Cir. 2009). "Nevertheless, courts properly consider whether the inmate retains other means for engaging in the particular religious activity, such as the 'Blot' ceremony, in assessing whether a denial of the inmate's preferred method for engaging that religious exercise imposes a substantial burden." *Shabazz v. Va. Dep't of Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013) (citing *Krieger*, 496 F. App'x at 326; *Coleman v. Governor of Mich.*, 413 F. App'x 866, 875–76 (6th Cir. 2011)). Thus, an inmate failed to demonstrate the denial of additional group study time imposed a substantial burden upon his religious exercise where prison officials already provided three hours of group study and worship time and allowed inmate to study in his cell. *See Van Wyhe v. Reisch*, 581 F.3d 639, 656–57 (8th Cir. 2009). Similarly, the United States Court of Appeals for the Sixth Circuit concluded that prison policies which limited the inmates' access to religious radio and television broadcasts failed to substantially burden the inmates' religious exercise because the inmates "may receive religious literature via the mail and may receive visitors at the prison to discuss their religious beliefs." *Coleman*, 413 F. App'x at 876.

20

Although Plaintiffs have two hours on Friday afternoon to conduct Jumah prayer and other services, Plaintiffs insist that they need at least seven (7) hours a week of group religious time to conduct all of their required activities. Specifically, Plaintiffs insists that they need: one (1) hour on Friday for Jumah prayer service; two (2) hours weekly for Fruit of Islam; two (2) hours weekly for congregate worship service; and two (2) hours weekly for Self-Improvement: The Basis for Community Development studies. (Am. Compl. ¶ 22.) As explained below, Plaintiffs fail to demonstrate their religious exercise has been substantially burdened by the failure to provide them with seven hours of group religious time. *See Van Wyhe*, 581 F.3d at 656–57.

The record reflects that Plaintiffs are offered enough time to conduct Jumah prayer and another hour of congregational worship. Plaintiffs fail to demonstrate the religious significance of two full hours of congregational worship, Fruit of Islam training, and Self-Improvement, such that the impairment of these activities places a substantial burden on their religious exercise.[14] *See Krieger*, 496 F. App'x at 326 (concluding inmate's "blanket assertion" "that the sacred items were 'necessary' to perform 'well-established rituals' " was insufficient to establish a substantial burden when inmate failed to "identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs"); *see also DeSimone v. Bartow*, 355 F. App'x 44, 46 (7th Cir. 2009) ("noting the insufficiency of a plaintiff's 'unreasoned say-so' to create a triable issue" (quoting *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006))); *Marron v. Jabe*, No. 1:12cv468(TSE/TRJ), 2014 WL 585850, at *5 n. 5 (E.D. Va. Feb. 14, 2014) (citations omitted). Furthermore, Plaintiffs fails to explain why performing their Fruit of Islam training or Self Improvement activities on an individual basis on their own free time would eliminate the

---

[14] Willie X fails to articulate why the tenets of the NOI prohibit him from conducting multiple religious activities during the allotted two-hour time period. (*See* Willie Decl. ¶ 13.)

religious significance of the activities. *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL
1098102, at *7 (E.D. Va. Mar. 15, 2013) (no substantial burden when inmate denied "preferred
method for engaging [in] that religious exercise" when inmate "retain[ed] other means for
engaging in the particular religious activity" (citing *Krieger*, 496 F. App'x at 326). Accordingly,
Claim 3(b) will be DISMISSED.

In Claim 3(a), Charles X raises a straightforward First Amendment challenge to the
limitation on group religious activities. In order for Charles X to survive summary judgment for
his First Amendment claim, Charles X must demonstrate Defendants' conduct substantially
burdens his religious exercise. *Whitehouse v. Johnson,* No. 1:10CV1175 (CMH/JFA), 2011 WL
5843622, at *5 (E.D. Va. Nov. 18, 2011). "RLUIPA provides considerably more protection for
an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the
United States." *Id.* at *5 (citing *Lovelace*, 472 F.3d at 186). Thus, "[w]here an inmate has not
put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious
exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van
Wyhe*, 581 F.3d at 657–58 (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir.
2008)). As explained above, Charles X has failed to demonstrate a substantial burden on his
religious exercise with respect to group religious time. Accordingly, Claim 3(a) will be
DISMISSED.

### E. Sermons of Minister Farrakhan - Claim 4

In Claim 4, Charles X and Victor X contend Defendants violated their rights under
RLUIPA and the First Amendment by refusing to allow them to purchase CDs of Minister
Farrakhan's weekly sermons from the Final Call, Inc. Given the availability of Minister

Farrakhan's sermons in the Chaplain's Library, Charles X and Victor X fail to demonstrate that their religious exercise has been substantially burdened. *See Smith v. U.S. Congress*, No. 3:12CV45, 2015 WL 1011545, at *14 (E.D. Va. Mar. 6, 2015) (rejecting nearly identical claim); *Shabazz v. Va. Dep't Corr.* No. 3:10CV638, 2013 WL 1098102, at *8 (E.D. Va. Mar. 15, 2013) (same). Accordingly, Claim 4 will be DISMISSED.

### IV. Conclusion

Plaintiffs' Motion for Summary Judgment (ECF No. 54) will be DENIED. Plaintiffs' objections will be OVERRULED. Plaintiffs' Motion to Strike (ECF No 59) will be DENIED. Defendants' Motion for Summary Judgment (ECF No. 47) will be GRANTED IN PART and DENIED IN PART. Claims 2 through 4 will be DISMISSED WITH PREJUDICE. Claims 1(a) and 1(b) will be REFERRED to the Honorable Roderick C. Young, United States Magistrate Judge, for all further proceedings, including an evidentiary hearing if necessary.

An appropriate Order shall issue.

Date: 8-23-16
Richmond, Virginia

/s/

James R. Spencer
Senior U. S. District Judge