## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**RAHEEM S. AL-AZIM, *et al.*,**

Plaintiffs,

v.                                                              Civil Action No. **3:14CV339**

**J. EVERETT, *et al.*,**

Defendants.

## REPORT AND RECOMMENDATION

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C.

§ 636(b)(1) as to Claims 1(a) and 1(b) of the Amended Complaint (ECF No. 36).  The Court held

an evidentiary hearing, and this matter is ripe for disposition.  For the following reasons, the

Court RECOMMENDS that Claims 1(a) and 1(b) be DISMISSED WITH PREJUDICE.

### I.       Procedural History

Raheem S. Al-Azim, Charles X, and Victor X ("Original Plaintiffs"), Virginia inmates

proceeding *pro se*, submitted this civil action.  By Memorandum Opinion and Order entered on

August 3, 2015 (ECF Nos. 42 & 43), the Court dismissed a number of the Original Plaintiffs'

claims.  *See Al-Azim v. Everett*, No. 3:14cv339, 2015 WL 4634456, at *7–8 (E.D. Va. Aug. 3,

2015).  By Memorandum Opinion and Order entered on August 23, 2016 (ECF Nos. 64 & 65),

the Court granted Defendants' Motion for Summary Judgment in part, dismissing Claims 2

through 4, and referred the remaining claims, Claims 1(a) and 1(b), to the undersigned for further

proceedings, including an evidentiary hearing.  *See Al-Azim v. Everett*, No. 3:14cv339, 2016 WL

4472964, at *11 (E.D. Va. Aug. 23, 2016).  Because Plaintiff Charles X was dismissed as a

plaintiff with respect to Claims 1(a) and 1(b) (*see Al-Azim v. Everett*, 2015 WL 4634456, at *6),

and only Claims 1(a) and 1(b) remain after the Court's August 23, 2016 Memorandum Opinion and Order (*see Al-Azim v. Everett*, 2016 WL 4472964, at *9–11), Charles X was effectively terminated as a plaintiff in this action on August 23, 2016, as reflected in the Court's Memorandum Opinion of August 23, 2016 describing Claims 1(a) and 1(b) (*see Al-Azim v. Everett*, 2016 WL 4472964, at *1), and as noted in the Court's Order of November 15, 2016 (ECF No. 76). Accordingly, only Plaintiffs Al-Azim and Victor X ("Plaintiffs") remain as plaintiffs in this action.

Seven defendants were named in the Amended Complaint. All claims against defendants Abernathy and Shear were dismissed by the Memorandum Opinion and Order issued on August 3, 2015 (ECF Nos. 42 & 43). All claims against defendants Puryear and Robinson were dismissed by the Memorandum Opinion and Order issued on August 23, 2016 (ECF Nos. 64 & 65). Accordingly, only Harold Clarke, Director of the Virginia Department of Corrections ("VDOC"), VDOC Regional Administrator Wendy S. Hobbs, and former Assistant Warden V. M. Washington[1] ("Defendants") remain as defendants in this action.

## II.   Summary of Allegations and Remaining Claims

Claims 1(a) and 1(b) of the Amended Complaint, the only claims remaining, allege as follows:

> (a) "Defendants Clarke, . . . Hobbs, . . . and Washington violated [Victor X's and Al-Azim's] First Amendment[2] right to practice their religion by refusing to provide them a diet reasonably consistent with *How To Eat To Live*, Volumes 1 and 2, by the Most Honorable Elijah Muhammad." (Am. Compl. 1.)

---

[1] Defense counsel clarified during the evidentiary hearing that the parties agreed that the intended defendant was former Assistant Warden V. M. Washington and not G. K. Washington. (Tr. 4:16–5:9.)

[2] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

(b) Defendants Clarke, Hobbs, and Washington violated Victor X's and Al-Azim's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA")[3] by failing to provide a diet reasonably consistent with *How To Eat To Live*. (*Id.* at 10.)

(*See Al-Azim v. Everett*, 2016 WL 4472964, at *1.) Plaintiffs allege that they are "sincere students and followers of the Most Honorable Elijah Muhammad under the leadership of the Honorable Minister Louis Farrakhan, the National Representative of the Most Honorable Elijah Muhammad and the Nation of Islam." (Am. Compl. ¶ 3.) They also allege that their "dietary tenets are outlined in *How To Eat To Live*[4] by the Most Honorable Elijah Muhammad," that *How To Eat To Live* requires them to train themselves to eat only one meal every twenty-four hours and to eat no meat or marine life, that much of the food served on the "regular daily menus" at Greensville Correctional Center "is forbidden by *How To Eat To Live*," that *How To Eat To Live* forbids Plaintiffs from consuming food that is contaminated by pork or its byproducts, and that the "so-called Common Fare diet" is "completely unacceptable" to Plaintiffs. (Am. Compl. ¶¶ 1–14.) Plaintiffs also allege that Defendants have been informed that "the Common Fare diet is totally unacceptable under *How to Eat To Live*," but Defendants refuse to provide a diet reasonably consistent with *How To Eat To Live*, thus violating Plaintiffs' rights under the First Amendment and RLUIPA. (Am. Compl. ¶¶ 15–17.)

Defendants deny that they have violated Plaintiffs' rights under the First Amendment or RLUIPA. (Answer, ECF No. 37, ¶ 12.)

---

[3] Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, 42 U.S.C. §§ 2000cc–1 *et seq.*

[4] *How To Eat To Live, Book No. 1* is Plaintiffs' Exhibit 7, and *How To Eat To Live, Book No. 2* is Plaintiffs' Exhibit 3.

### III.   Applicable Law

RLUIPA provides,[5] in pertinent part, that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—
      (1)  is in furtherance of a compelling governmental interest; and
      (2)  is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).  Plaintiffs bear the initial burden of showing by a preponderance of the persuasive evidence[6] that Defendants' conduct imposes a "substantial burden" on their religious exercise.  Once Plaintiffs meet their initial burden, Defendants bear the burden of persuasion on whether their conduct is the least restrictive means of furthering a compelling governmental interest.  *Lovelace v. Lee*, 472 F.3d 174, 185 (4th Cir. 2006).

To make the determination regarding Plaintiffs' prima facie case, the Court must answer two questions:  "(1) Is the burdened activity 'religious exercise,' and if so (2) is the burden 'substantial'?"  *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004); *see Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir. 2012) (employing similar two-part inquiry).

"RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'"  *Couch*, 679

---

[5] Similar to RLUIPA, in order to prevail on a First Amendment free exercise claim, Plaintiffs must demonstrate that Defendants' conduct substantially burdens their religious exercise.  *Whitehouse v. Johnson*, No. 1:10cv1175 (CMH/JFA), 2011 WL 5843622, at *5 (E.D. Va. Nov. 18, 2011).  "RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States."  *Id.* (citing *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir. 2006)).  Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well."  *Van Wyhe v. Reisch*, 581 F.3d 639, 657–58 (8th Cir. 2009) (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)).

[6] Because RLUIPA is silent on the standard of proof required, the Court applies the "usual preponderance of the evidence rule applicable to civil cases."  *See Versatile v. Johnson*, No. 3:09cv120, 2011 WL 5119152, at *3 n.9 (E.D. Va. 2011) (collecting cases).

F.3d at 200 (quoting 42 U.S.C. § 2000cc–5(7)(A)).  Plaintiffs' RLUIPA claim implicates one

activity: eating a diet consistent with *How to Eat to Live* by the Most Honorable Elijah

Muhammad (Claim 1(b)).  Defendants do not dispute that selecting a diet for religious purposes

qualifies as a religious exercise.  *See Lovelace*, 472 F.3d at 198–99.

RLUIPA does not define the term "substantial burden," *see Couch*, 679 F.3d at 200, but

the United States Court of Appeals for the Fourth Circuit has determined that the Supreme

Court's jurisprudence interpreting the Free Exercise Clause provides guidance on the issue.  *See*

*Lovelace*, 472 F.3d at 187.  Thus, the Fourth Circuit has explained that a substantial burden

> is one that put[s] substantial pressure on an adherent to modify his behavior and to
> violate his beliefs, or one that forces a person to choose between following the
> precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand,
> and abandoning one of the precepts of h[is] religion . . . on the other hand.

*Couch*, 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace*, 472 F.3d

at 187).  In the substantial burden inquiry, a plaintiff "is not required . . . to prove that the

exercise at issue is required by or essential to his religion." *Krieger v. Brown*, 496 F. App'x 322,

325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)).  Nevertheless,

"at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the

government's denial of a particular religious . . . observance was more than an inconvenience to

one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash*

*Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004));[7] *see Krieger*, 496 F.

App'x at 326 (affirming grant of summary judgment where inmate failed to "show that the

deprivation of an outdoor worship circle and the requested sacred items modified his behavior

and violated his religious beliefs" (citing *Lovelace*, 472 F.3d at 187)).  Thus, no substantial

---

[7] In *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), the Supreme Court abrogated *Smith*'s ultimate holding that RLUIPA allows for monetary damages against state officials acting in their official capacity.

burden exists if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Two recent cases from the Fourth Circuit illustrate a plaintiff's responsibility with respect to demonstrating a substantial burden. In *Couch v. Jabe*, the plaintiff "testified that the primary religious texts of Islam command that he grow a beard and that the refusal to maintain a beard is a sin comparable in severity to eating pork." *Couch*, 679 F.3d at 200. The VDOC's grooming policy prohibited inmates from growing beards and enforced this rule by placing a noncompliant inmate in a program that restricted or limited the inmate's "access to personal property, movement rights, the right to eat and associate with others, recreation time, and visitation time." *Id.* at 199. The Fourth Circuit concluded that VDOC's grooming policy and enforcement mechanism, "fit squarely within the accepted definition of 'substantial burden'" because it placed substantial pressure on the plaintiff to modify his behavior and violate his beliefs. *Id.* at 200–01 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 995–96 (9th Cir. 2005)).

In *Krieger v. Brown*, the Fourth Circuit declined to find an inmate had demonstrated a substantial burden where prison officials denied "his requests for an 'outdoor worship circle' and certain 'sacred items' related to his religious practice of Asatru." *Krieger*, 496 F. App'x at 322. The plaintiff "asserted that deprivation of the outdoor worship circle would require him to pray indoors, and that the 'Blot' ceremony is '*best* performed outdoors.'" *Id.* at 325 (emphasis added). The Fourth Circuit concluded that the mere denial of the optimal manner for performing the "Blot" ceremony could not demonstrate a substantial burden where the plaintiff "failed to offer any explanation regarding the reason why indoor worship would compromise his religious

6

beliefs." *Id.* Similarly, the inmate failed to demonstrate a substantial burden with respect to the denial of additional sacred items when he simply made the "blanket assertion" that "the sacred items were 'necessary' to perform 'well-established rituals.'" *Id.* at 326. The Fourth Circuit noted that plaintiff "did not identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs." *Id.*

*Krieger* illuminates another consideration in conducting the substantial burden inquiry. The availability to an inmate, in the most general sense, of other means to practice his or her faith is not relevant to the RLUIPA substantial burden inquiry. *Al–Amin v. Shear*, 325 F. App'x 190, 193 (4th Cir. 2009). "Nevertheless, courts properly consider whether the inmate retains other means for engaging in the particular religious activity, such as the "Blot" ceremony, in assessing whether a denial of the inmate's preferred method for engaging that religious exercise imposes a substantial burden." *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013) (citing *Krieger*, 496 F. App'x at 326; *Coleman v. Governor of Mich.*, 413 F. App'x 866, 875–76 (6th Cir. 2011)). Thus, an inmate failed to demonstrate the denial of additional group study time imposed a substantial burden upon his religious exercise where prison officials already provided three hours of group study and worship time and allowed the inmate to study in his cell. *See Van Wyhe v. Reisch*, 581 F.3d 639, 656–57 (8th Cir. 2009). Similarly, the United States Court of Appeals for the Sixth Circuit concluded that prison policies that limited inmates' access to religious radio and television broadcasts failed to substantially burden the inmates' religious exercise because the inmates "may receive religious literature via the mail and may receive visitors at the prison to discuss their religious beliefs." *Coleman*, 413 F. App'x at 876.

Moreover, RLUIPA does not "preclude inquiry into 'the sincerity of a prisoner's professed religiosity.'" *Lovelace*, 472 F.3d at 187 n.2 (quoting *Cutter*, 544 U.S. at 725 n.13; *cf. Gillette v. United States*, 401 U.S. 437, 457 (1971) ("The 'truth' of a belief is not open to question; rather, the question is whether the objector's beliefs are 'truly held.'" (internal quotation marks and citation omitted))).

If a plaintiff demonstrates a substantial burden on his religious exercise, then the Court must determine whether the prison officials can establish that (1) the denial of the plaintiff's request, *i.e.*, the imposition of the burden, was in furtherance of a compelling governmental interest, and (2) the imposition of the burden "is the least restrictive means of furthering that compelling governmental interest." *Couch*, 679 F.3d at 201–02 (citing 42 U.S.C. § 2000cc–1(a)(1)–(2)). To show that a policy is "the least restrictive means" of furthering a compelling governmental interest, prison officials must demonstrate that they have "consider[ed] and reject[ed]" less restrictive alternatives to the challenged practice. *Id.* at 203.

## IV. Findings of Fact

Based on the evidence and testimony presented at the evidentiary hearing, the Court makes the following findings of fact.

### A. Findings of Fact Pertaining to the Nation of Islam Diet

1. Plaintiffs are practicing members of the National of Islam ("NOI") under the leadership of the Most Honorable Elijah Muhammad and Minister Louis Farrakhan. (Tr. 56:14–17, 110:11–16.)

2. Plaintiffs believe that their religion requires them to obey Elijah Muhammad and Louis Farrakhan and to follow the Guiding Rules of Conduct (Pls.' Ex. 4). (Tr. 56:18–24, 62:13–63:5, 64:13–65:9, 110:17–23, 119:5–120:10.)

3.  Elijah Muhammad set forth what Plaintiffs refer to as dietary "requirements" for members of the NOI in *How To Eat To Live*. (Tr. 12:10–11, 57:8–17, 111:2–12; Pls.' Ex. 3; Pls.' Ex. 7.)

4.  Plaintiffs contend that *How To Eat To Live* requires Plaintiffs to "train [them]selves to eat one meal a day," with no snacks between meals, "to train [them]selves to eat no meat and no fish," and to eat the foods approved by *How To Eat To Live*. (Tr. 12:7–17, 22:21–24:15, 121:18–122:18; Pls.' Ex. 3; Pls.' Ex. 7.)

5.  Plaintiffs contend that *How To Eat To Live* prohibits Plaintiffs from eating foods that are "contaminated with pork." (Tr. 12:24–15:14, 16:10–19:7; Pls.' Ex. 3; Pls.' Ex. 7.)

6.  *How To Eat To Live* is supplemented by "The Restrictive Laws of Islam" and an edition of The Final Call entitled, "Vegetarianism is best." (Tr. 10:25–11:3, 20:20–21:24; Pls.' Ex. 5; Pls.' Ex. 6.)

7.  *How To Eat To Live* includes the following statements regarding food choices: "vegetables, milk and butter are the right foods to eat, when they are pure;" "[v]irtually all vegetables are good to eat except collard greens and turnip salad;" "[c]abbages are good, . . . but not the green leaves;" "[e]at some spinach, but do not become an habitual spinach eater;" "[e]at rutabaga—a little every now and then;" "[y]ou may eat as much garlic and onion as you like, but no sweet potatoes and no white potatoes;" "[t]here are many more vegetables you will find edible or forbidden to eat in this book;" eat no peas, no beans, except "the small navy [bean];" "[v]irtually all fruits are good," except "processed dried grapes;" "[e]at whole wheat, but not the whole grain . . . [and] never white flour;" do not "eat half cooked bread;" and "[e]at the best food you can obtain." (Pls.' Ex. 3, at 20, 77; Pls.' Ex. 7, at 4, 5, 6.)

8. *How To Eat To Live* includes the following statements about foods to be avoided, including: "foods such as pig, nuts, white flour, meats (of course, we eat some meats), the wrong kind of peas, the wrong kinds of breads, half-cooked breads, too many starchy foods, and too much sweets;" (Pls.' Ex. 3, at 10; Pls.' Ex. 7, at 29–30); swine is a "divinely-prohibited flesh;" (Pls.' Ex. 7, at 12, 13, 17, 69, 105; Pls.' Ex. 3, at 19, 37); "[i]t is not a sin for you to eat meat, but it is a sin for you to eat the hog-meat." (Pls.' Ex. 3, at 78.)

9. The dietary guidance for the followers of the NOI has evolved over time, and a review of *How To Eat To Live*, as supplemented, indicates that there are numerous inconsistencies. Plaintiffs contend that they may not eat meat or marine life, but there are statements to the contrary in *How To Eat To Live*, for example:

- "Stay away from eating a lot of meats and do not eat too much fish that is weighing from 20 to 50 pounds.  You should eat fish weighing a half pound to ten pounds." (Pls.' Ex. 3, at 67.)

- Compare "[c]hickens are not fit to eat" with "Eat meat? If so, eat clean, fresh meat whether it is beef, lamb or chicken.  Change sometimes, and have fish for your meal." (Pls.' Ex. 7, at 11, 25.)

Other inconsistencies exist, for example:

- Compare "eat . . . no white potatoes" with "do not eat those white potatoes at every meal; they are full of starch." (Pls.' Ex. 7, at 4, 25.)

- Compare "Allah forbids us to eat peas" with "I have said to eat no peas.  At that time, I did not think about what we call sweet peas, which grow into pods.  They can be eaten, but not field peas." (Pls.' Ex. 7, at 4, 88.)

10. *How To Eat To Live* states that the "eating regulations . . . are a 'must' . . . and that

the NOI followers should "[b]egin at once." But Elijah Muhammad "recognizes that

because black people in America, particular[ly] his followers, have grown—grew up

eating meat, we grew up eating flesh, he told us to use a process of gradualism and

stop eating meat, stop eating fish." (Tr. 39:9–16.) "Vegetarianism is best" (Pls.' Ex.

6) states that "[g]radualism is a universal principle of Divine Law found in nature"

and that "these steps must be taken gradually" (Pls.' Ex. 6, at 1–2), but it also states

that "vegetarianism must be the accepted and usual standard" and that "that day has

arrived." (Pls.' Ex. 6, at 2.)

11. "The Restrictive Laws of Islam" (Pls.' Ex. 5) list the following "laws":

1. Worship no God but Allah, The One the Messenger represents to us.
2. It is forbidden to commit fornication or adultery.
3. It is forbidden to commit indecent acts on another (sodomy).
4. **It is forbidden to eat the pig or its by products [sic].**
5. No stealing.
6. No gambling of any kind (numbers, dice, cards, games of chance).
7. No smoking of any kind (reefers or cigarettes, cigar or pipe).
8. No drinking (wine, whiskey, beer, ale, alcohol or other intoxicants).
9. No dope (heroin, cocaine or any other).
10. Do not associate with those in bad standing or out of Mosque.
11. Kill no one whom Allah has not ordered to be killed.
12. Do not commit acts of violence on ourselves or others.
13. Do not deal with the hypocrite or show sympathy towards them.
14. Insubordination is forbidden.
15. Slack talk and gossip is forbidden.
16. Do not feel, rub or pat sisters.

(Pls.' Ex. 5 (emphasis added).)

12. *How To Eat To Live* states: "Do not eat the swine flesh. It is forbidden by the divine

law of Allah (God)." This restriction is then followed by a list of other foods that

should be avoided. (Pls.' Ex. 7, at 63.) The NOI dietary restriction against pork,

which is a "divinely-prohibited flesh," differs from other dietary restrictions that are advised but not "divinely-prohibited."

**B. Findings of Fact Pertaining to Plaintiffs' Contentions about the Menu Options**

13. Plaintiffs and witnesses Johnathan Lee X and Charles X describe the menu options available to them at Greensville Correctional Center, where they are incarcerated. They contend that neither the "Regular Menu" (referred to as the "Standard Menu" on Pls.' Ex. 1) nor the Common Fare Menu meets their dietary requirements. (Tr. 12:18–19:7, 62:3–12, 65:4–66:24, 86:10–87:13, 91:11–92:25, 102:2–103:9, 117:18–119:3, 121:18–122:21; Pls.' Ex. 1 (Standard Menu) & Pls.' Ex. 2 (Common Fare Menu).)

14. Plaintiffs and witnesses Johnathan Lee X and Charles X contend that there is contamination with pork of the cooking, serving, and eating utensils and trays, such that even the foods that would otherwise meet their dietary requirements may be contaminated. (Tr. 12:18–13:10, 16:7–20, 25:9–26:12, 27:20–31:4, 48:6–49:22, 87:11–13, 112:18–116:16, 117:25–118:3.)

15. Plaintiff Al-Azim participates in the Common Fare Program, and he has signed the Common Fare Agreement. Al-Azim states that he signed the agreement "[b]ecause they forced us" and he had to "sign or [] get off Common Fare." Al-Azim contends that he eats one meal per day. Plaintiff Victor X does not participate in the Common Fare Program, receiving instead the Standard Menu meals. (Tr. 64:13–66:24, 112:2–14, 120:11–121:8, 124:9–12.)

16. Plaintiff Al-Azim contends that he has lost weight and suffered stress and tiredness as a result of not being provided a diet consistent with *How To Eat To Live* but also

contends that his weight has remained between 180 and 200 pounds during his period of incarceration. Plaintiff Victor X also contends that he has lost weight and suffered stress and felt sluggish as a result of not being provided a diet consistent with *How To Eat To Live*, but he weighs approximately thirty-four pounds more than when he first came into the VDOC. (Tr. 57:18–58:9, 62:13–65:9, 67:21–68:13, 118:4–124:13, 126:23–128:4; Defs.' Ex. 3 (Al-Azim's Sealed Medical Records); Defs.' Ex. 4 (Victor X's Sealed Medical Records).)

## C. Findings of Fact Pertaining to the VDOC's Common Fare Program

17. The VDOC recognizes approximately twenty-eight different religions, many of which have dietary restrictions. (Tr. 134–137:11.)

18. Those restrictions include the types of food, the way meat is slaughtered, the way food is stored and prepared, the way the cooking tools are cleaned, and the way the food is served. Some religious diets also require fasting at certain times and feasts at certain times. (Defs.' Ex. 2 (Operating Procedure No. 841.3, Offender Religious Programs); Defs.' Ex. 5 (Food Service Manual, Ch. 4, Religious Diets/Common Fare Meals); Tr. 144:20–146:21, 159:3–161:13, 170:14–174:7, 176:7–177:16.)

19. The VDOC offers a Standard Menu and, at seventeen VDOC facilities, the Common Fare Program. Both menus are designed to provide approximately 2500 to 2600 calories per day and to be nutritionally adequate. Approximately 3000 inmates participate in the Common Fare Program, which is designed to meet the religious dietary needs of inmates whose needs cannot be met by the Standard Menu. (Tr. 140:23–24, 169:8–172:21, 206:21–207:23; Defs.' Ex. 2 (Operating Procedure No.

841.3, Offender Religious Programs); Defs.' Ex. 5 (Food Service Manual, Ch. 4, Religious Diets/Common Fare Meals); Defs.' Ex. 7 (Common Fare Menu).)

20. The VDOC administers forty-one separate institutions, and NOI adherents, of which there are approximately 1400, are housed at approximately twenty VDOC facilities. (Tr. 139:20–140:8.)

21. The approximately 1400 adherents of the NOI are of differing security levels, with "most of them clustered probably between Security Level 2 and Security Level 5, 6." (Tr. 140:9–12.)

22. At Greensville Correctional Center, there were approximately forty inmates who were listed as NOI adherents on the Master Pass list for October 14, 2011 (Defs.' Ex. 11) and approximately 120 inmates who were listed as NOI adherents on the Master Pass list for November 11, 2016 (Defs. Ex. 12). Plaintiffs dispute that all of the NOI adherents listed on the Master Pass list are sincere followers of the NOI. (Tr. 156:13–157:5, 266:2–267:2, 268:23–269:1, 272:20–274:2.)

23. The Food Service Manual, Chapter 4, Religious Diets/Common Fare Meals (Defs.' Ex. 5) sets forth the religious diet program, referred to as the Common Fare Program, developed by the VDOC to "reasonably accommodate[] special diets to meet the basic nutritional needs of offenders whose religious beliefs require the adherence to religious dietary laws." It sets forth how the meals are prepared, cooked, and provided to the inmates. "The Common Fare Menu has been analyzed and certified to meet or exceed minimum daily nutritional requirements." (Defs.' Ex. 5; Tr. 176:7–177:16.)

24. The Food Service Manual, Chapter 6, Sanitation and Safety (Defs.' Ex. 6) "provides protocols to establish uniform sanitary and safety standards for Department of Corrections Food Service operations and to provide guidance for personnel in the principles of food service sanitation, food safety, and compliance with health and safety regulations." (Defs.' Ex. 6; Tr. 177:17–178:18.)

25. The Common Fare Program requires foods that are certified kosher and pork-free, and it uses more fresh fruits and vegetables. (Tr. 170:21–171:11; Defs.' Ex. 5.)

26. The Common Fare Agreement (Defs.' Ex. 1), which all inmates approved for the Common Fare Program are required to sign, provides that the participating inmates may not "eat[], trade[], or possess[] unauthorized food items from the main line," may not "give[] away or trade[] a Common Fare food item," and may not "purchase[] or . . . eat[] food items from the Commissary inconsistent with the dietary requirements of the Common Fare program."   The Common Fare Diet Attendance Log in VACORIS [must be] completed at each meal for offenders receiving Common Fare meals." (Defs.' Ex. 5.) An inmate may be removed from the Common Fare Program if he "fails to pick up a minimum of seventy-five percent of meals served per month" or otherwise violates the Common Fare Agreement. (Defs.' Ex. 1, Defs.' Ex. 5.)

27. To ensure that the foods served on the Common Fare Menu are not contaminated, VDOC policies require (1) specific training for food service staff, including offender staff, who prepare the foods served on the Common Fare Program; (2) specific procedures as outlined in the Food Service Manual, Chapters 4 and 6 (Defs.' Ex. 5, Defs.' Ex. 6); and (3) regular inspections and supervision by the VDOC staff within the facility and from the VDOC headquarters.   The inspections and supervision

15

ensure that the VDOC policies and procedures are followed so there is no contamination of the Common Fare meals. (Tr. 148:15–19, 178:20–180:6, 195:1–19, 203:6–206:9, 210:5–211:25, 215:20–221:13, 222:25–223:9, 224:22–227:9, 235:3–250:25; Defs.' Ex. 5; Defs.' Ex. 6.)

28. At Greensville Correctional Center, there is one main kitchen, where most of the cooking is done, and three satellite kitchens, where meals are served in a dining hall setting, in addition to service at the hospital infirmary and the segregation unit. All of the Common Fare food is prepared in the main kitchen and transported in insulated boxes and trams to the other locations. The Common Fare food is prepared and transported separately from the food on the Standard Menu. (Tr. 198:1–204:14, 222:5–223:12, 238:19–239:13; Defs.' Ex. 5.)

29. At Greensville Correctional Center, the Common Fare Menu is prepared in its own separate area within the kitchen, using separate ovens and separate storage areas. There are separate trays, and the trays have covered lids. There are separate cooking pans and utensils, separate serving utensils, and there are separate eating utensils— trays with lids, sporks, and tumblers—that are a different color. Many of the Common Fare items are labeled with "CF," and many of the Common Fare utensils are kept in a separate enclosed locked container with a shadow board and signed out for accountability. (Tr. 149:12–150:14, 172:22–174:6, 185:25–187:22, 212:2–12, 212:18–213:86 235:14–240:15, 249:25–250:20; Defs.' Ex. 5.)

30. The inmates who participate in the Common Fare Program are served before those who eat the Standard Menu, and the Common Fare trays, lids, utensils, and cups are

washed before the items used to serve the Standard Menu are washed, in an electric dish machine. (Tr. 204:23–206:5, 216:22–219:7, 239:2–249:24; Defs.' Ex. 5.)

31. The VDOC consulted with religious leaders when it was designing the Common Fare Program. The local Islamic Center confirmed to the VDOC that the Common Fare Menu meets their dietary needs. The VDOC attempted to contact NOI authorities outside the prison setting in order to determine whether the Common Fare Menu was adequate for NOI adherents but, despite having left messages for NOI authorities outside the prison setting, those authorities did not respond to the VDOC. (Tr. 137:1–137.11, 182:9–183:16).

**D. Findings of Fact Pertaining to Exceptions to the VDOC's Common Fare Menu**

32. Within the VDOC, individualized NOI meals are prepared for only two offenders. These offenders, who are incarcerated at Buckingham Correctional Center, receive the individualized NOI meals pursuant to a consent order issued many years ago. These individualized NOI meals cost $2.70 per meal, as opposed to $1.35 per meal for the Common Fare Program. (Tr. 138:17–139:19, 157:10–158:16.)

33. During Ramadan, which lasts approximately thirty (30) days, the VDOC prepares the Ramadan and NOI Month of Fasting Menus, serves two meals a day from those menus, and serves those meals before sunrise and after sunset, all of which is "quite an undertaking" because it requires that the kitchens be staffed almost 24 hours a day. VDOC explains that it is difficult but manageable since it is only for a thirty-day period and the meal service is outside of the normal food serving times. (Tr. 159:3–161:16, 163:9–164:18; Defs.' Ex. 2; Defs.' Ex. 5.)

**E. Findings of Fact Pertaining to the Consideration of Less Restrictive Alternatives**

34. If, in addition to the Standard Menu and the Common Fare Menu, the VDOC were to permanently add an individualized NOI menu, it would require: separate kitchen facilities and equipment, which would very likely require construction; additional staffing; separate pots, pans, cooking implements, eating utensils, and trays; and additional food costs. The VDOC purchases food in bulk, including all the kosher food, to reduce food costs. Seasonal availability of fresh fruits and vegetables affects the menu options, and acquiring particular fresh produce may be cost-prohibitive during some seasons. Permanently adding an individualized NOI menu would result in an enormous financial burden on the VDOC. (Tr. 140:13–142:22, 147:17–149:5, 172:1–16, 180:24–182:8.)

35. Permanently adding an individualized NOI menu would extend meal times, "completely throw[] the 24-hour clock off of schedule, which includes specific times for things that are important to the security part," and also would impact inmate educational programming and other programs that support reentry. (Tr. 142:20–143:8, 148:1–149:1.)

36. Permanently adding an individualized menu for one religious group would very likely result in other religious groups demanding an individualized menu as well. (Tr. 141:7–222, 161:24–162:13, 164:19–165:19, 180:7–23.)

37. To place all NOI adherents, currently approximately 1400, into one facility in order to offer an individualized NOI menu would be both extremely difficult and inconsistent with the VDOC's mission to support reentry because (1) there are various security levels among the NOI adherents, requiring different security restrictions; and (2)

inmates who are closer to reentry are moved to facilities that are nearer to the communities in which they will be living in order to facilitate the transition. (Tr. 135:22–136:2, 143:9–144:19.)

38. The VDOC could not design and deliver an individualized NOI meal once a day to NOI adherents because (1) it would be too many calories (2500 to 2600) to eat during a single twenty-minute meal period, and inmates are not permitted to take food back to their cells; and (2) it would not be nutritionally adequate in terms of needed vitamins and minerals. (Tr. 169:8–170:13, 174:11–176:3, 191:3–20; Defs.' Ex. 5.)

**F. Findings of Fact Pertaining to Plaintiffs' Voluntary Consumption of Items Inconsistent with Their Professed Beliefs**

39. Inmates at Greensville Correctional Center may order items from the commissary, but those items may not be transferred to other inmates. Records demonstrate that Plaintiffs have purchased food items from the commissary that are either prohibited or discouraged by *How To Eat To Live*. (Defs.' Ex. 8 (GCC Commissary List); Defs.' Ex. 9 (Victor X's Commissary Record); Defs.' Ex. 10 (Raheem S. Al-Azim's Commissary Record).)

40. Plaintiff Al-Azim has purchased chili ramen, shrimp ramen, crackers, mackerel filet, pizza sauce, chicken ramen, mozzarella cheese stick, Cajun shrimp instant lunch, jalapeno cheese spread, spicy refried beans, sodas, cookies, BBQ corn chips, popcorn, peanuts, and smoked oysters. (Defs.' Ex. 10 (Raheem S. Al-Azim's Commissary Record).)

41. Plaintiff Victor X has purchased beef ramen soup, mozzarella cheese stick, crackers, cookies, peanuts, tuna, Cajun shrimp instant lunch, hot and spicy summer sausage,

hot chili with beans, jalapeno cheese spread, lasagna with beef, chicken breast, and spicy refried beans. (Defs.' Ex. 9 (Victor X's Commissary Record).)

42. Plaintiffs admit to eating some of the purchased food items and contend that, contrary to VDOC policy, they transferred some food items to other inmates. (Tr. 70:24–80:12, 129:2–130:2, 255:4–259:2, 274:20–24; Defs.' Ex. 8 (GCC Commissary List); Defs.' Ex. 9 (Victor X's Commissary Record); Defs.' Ex. 10 (Raheem S. Al-Azim's Commissary Record).)

43. Plaintiff Victor X chooses not to participate in the Common Fare Program which, if it were chosen, would provide Victor X a pork-free menu. (Tr. 65:23–66:4.)

**G. Findings of Fact Pertaining to Plaintiffs' Claims Regarding Pork and Contamination**

44. Plaintiffs contend that the exercise of their religion requires them not to consume pork or food that is contaminated by pork. (Tr. 12:24–15:14, 16:10–19:7; Pls.' Ex. 3; Pls.' Ex. 7.)

45. The Common Fare Program provides a pork-free menu. (Tr. 170:21–171:11; Defs.' Ex. 5.)

46. The Common Fare Program provides significant safeguards to prevent contamination by pork of the foods served on the Common Fare menu. (*See* Section IV. C. above.)

47. Plaintiffs' evidence regarding contamination was speculative and conclusory, was not persuasive, and is rejected.

48. The evidence presented that the Common Fare Programs provides food options that are both pork-free and free of pork contamination was persuasive and credible and is accepted.

49. As stated above, Plaintiff Al-Azim participates in the Common Fare Program and, thus, has food options that are pork-free and free of pork contamination.

50. As stated above, Plaintiff Victor X chooses not to participate in the Common Fare Program which, if it were chosen, would provide Victor X a pork-free menu.

**H. Findings of Fact Pertaining to Plaintiffs' Claims Regarding Eating One Meal per Day**

51. Plaintiffs contend that the exercise of their religion requires them to train themselves to eat one meal per day.

52. Plaintiff Al-Azim contends that he eats one meal per day. (Tr. 112:2–14.)

53. Although the Common Fare Program requires participants to sign the attendance log and pick up at least seventy-five percent of meals each month or risk removal from the Program, (Defs.' Ex. 5), Plaintiffs are not required to eat three times per day.

54. Plaintiffs are free to eat only one meal per day, and the exercise of their religion is not adversely impacted.

**I. Findings of Fact Pertaining to Plaintiffs' Claims Regarding Foods that are Discouraged as Unhealthy Food Choices in *How To Eat To Live*.**

55. Plaintiffs are not required to eat the foods served on either the Standard Menu or the Common Fare Menu that are discouraged as unhealthy food choices in *How To Eat To Live*.

56. Plaintiffs failed to articulate the religious significance of not eating any particular food item with the exception of pork, which is "divinely-prohibited" in the NOI.

57. Plaintiffs may discard any of the foods served on either the Standard Menu or the Common Fare Menu that are discouraged as unhealthy food choices in *How to Eat To Live*.

58. Plaintiffs fail to demonstrate that the Common Fare Menu is inconsistent with their religious dietary beliefs. Given the flexibility and the inconsistency of the dietary admonitions in *How To Eat To Live* and Plaintiffs' voluntary consumption of items either prohibited or discouraged by that text, Plaintiffs fail to demonstrate that the VDOC meal options adversely impact the exercise of their religion.

## V.   Analysis

### A. Plaintiffs Do Not Demonstrate a Substantial Burden on their Religious Exercise under RLUIPA

As noted previously herein, Plaintiffs claim that their rights under the First Amendment and RLUIPA are being violated by Defendants' purported failure to provide them "a diet reasonably consistent with *How To Eat To Live*." The applicable test requires the Court to answer two questions: (1) is the burdened activity "religious exercise," and, if so, (2) is the burden "substantial"?

Defendants do not dispute that selecting a diet for religious purposes qualifies as a religious exercise, thus answering the first question. *See Lovelace v. Lee*, 472 F.3d 174, 198–99 (4th Cir. 2006). The Court will not address whether complying with the particular dietary requirements Plaintiffs contend are mandated by the NOI religion is a "religious exercise," but will assume, for purposes of this civil action, based on the broad definition of "religious exercise" in RLUIPA, that such is the case.[8]

---

[8] Plaintiffs claim that eating a diet consistent with *How To Eat To Live* requires that they train themselves to eat one meal a day and to comply with the other dietary restrictions set forth in *How To Eat To Live*. Defendants argue that, except for the requirement that NOI adherents not eat pork, most of the restrictions in *How To Eat To Live* are aspirational rather than mandated by the NOI religion. Some courts have found that *How To Eat To Live* and the writings of Elijah Muhammad provide NOI adherents with guidance on healthy eating, but are not the issuance of a religious mandate to eat in accordance with the book. *See Farrakhan v. Johnson*, No. 1:08cv438 (TSE/JFA), 2009 WL 1360864, at *7 (E.D. Va. May 13, 2009) (categorizing inmate's complaints about "offensive" foods based on writings by Elijah Muhammad as secular); *Jones v.*

The second question is whether Plaintiffs have demonstrated a substantial burden on their religious exercise under RLUIPA. As explained below, the Court concludes that they have not.

Plaintiffs fail to demonstrate that the VDOC's provision of the two menu options, the Standard Menu and the Common Fare Menu, places pressure on them to violate their religious beliefs or abandon one of the precepts of their religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007). Initially, Plaintiffs' religious desire to avoid the consumption of pork or food contaminated by pork is fully accommodated by the VDOC's provision of the Common Fare Program.

Further, other than the avoidance of pork, the evidence shows significant inconsistency in the composition of the diet that Plaintiffs claim is mandated by their religion. (Findings of Fact ¶¶ 7–10.) Thus, it is difficult to ascertain whether the menu options available to them frustrate their ability to eat in accordance with their alleged dietary requirements. There is also uncontroverted evidence that Plaintiffs, through their voluntary food selection at the commissary, do not consistently follow their stated NOI dietary requirements but, instead, eat some food items purchased from the commissary that are either prohibited or discouraged by *How To Eat To Live*. Plaintiff Victor X actually chooses the Standard Menu, rather than the Common Fare Program,

---

*Shabazz*, No. H–06–1119, 2007 WL 2873042, at *13 (S.D. Tex. Sept. 28, 2007) (explaining that "[t]hese exhibits do not show Muhammad is issuing a religious mandate that not eating potatoes, beans, or bread is a matter of religious doctrine, but rather, they tend to show discourses by Muhammad about healthy eating habits"), *aff'd* 352 F. App'x 910, 916 (5th Cir. 2009) (affirming district court and explaining that inmate's "personal[ ] belie[f] that he may not eat those foods" failed to demonstrate that those foods are prohibited by his NOI faith); *Muhammad v. Warithu-Deen Umar*, 98 F. Supp. 2d 337, 345 n.3 (W.D.N.Y. 2000) (explaining that in "'How to Eat to Live,' Elijah Muhammad sets forth both general and specific dietary guidelines for 'good health and prolongation of life'"); *cf. DePaola v. Va. Dep't of Corr.*, No. 7:12CV00592, 2014 WL 3956108, at *3–4 (W.D. Va. Aug. 12, 2014) (finding NOI inmate offered "nothing to support his claim that his desire to avoid eating white bread, peanut products, grapefruit, cottage cheese, and peas is based on a sincerely held religious belief rather than a merely secular, personal preference" and thus, the Common Fare diet "substantially accommodates his religious dietary needs").

even though the Standard Menu is not pork-free. (Findings of Fact ¶¶ 39–42; Tr. 71:13–14, 255:4–259.2, 274:20–24; Defs.' Ex. 8, Defs.' Ex. 9, Defs.' Ex. 10.) At most, the evidence here demonstrates that the VDOC's provision of the Standard Menu and the Common Fare Menu, and not an individualized NOI menu, makes Plaintiffs' "religious exercise more . . . difficult." *Living Water Church*, 258 F. App'x at 739.

Plaintiffs contend that they want to eat one meal a day and that *How To Eat To Live* requires NOI adherents to "train [them]selves to eat one meal a day." (Tr. 12:7–11.) *How To Eat To Live* states: "Eat one meal a day or one meal every other day, and it will prolong your life." (Pls.' Ex. 7, at 22.) Within the VDOC, inmates are required to attend the service of each meal. Plaintiff Al-Azim explained that "[y]ou've gotta go get the name scratched off." (Tr. 112:1–13.) Moreover, "the Common Fare Diet Attendance Log in VACORIS [must be] completed at each meal for offenders receiving Common Fare meals." (Finding of Fact ¶ 26; Defs.' Ex. 5.) An inmate may be removed from the Common Fare Program if he "fails to pick up a minimum of seventy-five percent of meals served per month." (Finding of Fact ¶ 26; Defs.' Ex. 5.) But despite these requirements to participate in the Common Fare Program, inmates are not required to *eat* each meal. Plaintiff Al-Azim explained that he "only eat[s] one meal a day." (Finding of Fact ¶ 15; Tr. 112:1–13.) Thus, Plaintiffs are not prevented by VDOC policies and procedures from eating one meal each day.

Plaintiffs also contend that they want a diet reasonably consistent with *How To Eat To Live*, as described previously herein. Defendants provide inmates with two options—the Common Fare Program or the Standard Menu—but Plaintiffs contend that neither option meets their dietary requirements. In order to meet their dietary requirements, Plaintiff Al-Azim has chosen to participate in the Common Fare Program, the menu specifically developed by the

VDOC to meet "the basic nutritional needs of offenders whose religious beliefs require the adherence to religious dietary laws," (Defs.' Ex. 5), while Plaintiff Victor X has chosen to participate in the Standard Menu rather than in the Common Fare Program. Each may eat the food items on his chosen menu that comply with his dietary requirements. Moreover, as noted previously, Plaintiffs voluntarily consume some food items purchased from the commissary that are either prohibited or discouraged by *How To Eat To Live*. *Cf. McKennie v. Texas Dep't of Crim. Justice*, No. A–09–CV–906–LY, 2012 WL 443948, at *11 (W.D. Tex. Feb. 10, 2012) (explaining that an inmate "can hardly complain" that Defendant's failure to provide him with desired vegan diet "substantially burdens his religion when he supplements his diet with nonvegan food items" from the commissary); *Ford v. Fed. Bureau of Prisons*, No. 08–cv–00882–LTB–BNB, 2011 WL 2415790, at *9–10 (D. Colo. May 24, 2011) (concluding that plaintiff failed to "establish a prima facie case regarding whether he has sincere religious beliefs based on the *How to Eat to Live* books" when unrefuted evidence demonstrated personal practices that vary from its tenets).

Plaintiffs fail to demonstrate that Defendants' provision of the Common Fare Menu and the Standard Menu, and not an individualized NOI menu, substantially burdens their religious exercise under RLUIPA. Each may choose to eat the items on the menu he has selected that comply with his dietary requirements, discard the items that do not comply, and supplement his diet with food items from the commissary. *See Muhammad v. Mathena*, No. 7:14–cv–00134, 2015 WL 300363, at *3 (W.D. Va. Jan. 22, 2015); *see also Frazier v. Ferguson*, No. 04–5140, 2006 WL 2052421, at *4 (W.D. Ark. June 28, 2006) (finding no substantial burden under RLUIPA for an inmate who had to discard some food from the diet that was at odds with his vegan diet). Although Plaintiffs complain that they have lost weight and have suffered stress and

tiredness, the evidence does not support weight loss or substantial stress or tiredness. There is no evidence that either Al-Azim or Victor X has suffered adverse medical concerns from the menu each has chosen. The lack of an individualized NOI menu has not substantially burdened Plaintiffs' religious exercise under RLUIPA.

### B. VDOC's Provision of the Common Fare Program and the Standard Menu Furthers Compelling State Interests by the Least Restrictive Means

Even if Plaintiffs had demonstrated that Defendants' provision of the Common Fare Program and the Standard Menu, and not an individualized NOI menu, substantially burdened their religious exercise under RLUIPA, Defendants have established that the two menu options provided by the VDOC further compelling state interests of uniformity, cost-efficiency, and maintaining inmate health, by the least restrictive means.

If an inmate establishes a substantial burden on his religious exercise, the defendants must show that the policy is the least restrictive means of furthering a compelling government interest. *Lovelace*, 472 F.3d at 189. Courts must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (citations omitted) (internal quotation marks omitted). "RLUIPA . . . is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs." *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007) (citation omitted). Instead, courts should apply RLUIPA "in an appropriately balanced way, with particular sensitivity to security concerns." *Cutter*, 544 U.S. at 722.

The evidence establishes that the VDOC took substantial care to design and implement the Common Fare Program, which has been certified by both nutritionists and religious experts

as accommodating all recognized religions.    (Findings of Fact ¶¶ 17–19, 23, 31.)    The uncontroverted evidence demonstrates that the Common Fare menu and procedures further compelling state interests of uniformity and cost-efficiency. *See Muhammad*, 2015 WL 300363, at *3 n.4 (finding Common Fare diet furthers compelling interests of cost efficiency and uniformity); *DePaola*, 2014 WL 3956108, at *4 (finding "self-evident" that Common Fare menu "furthers legitimate and neutral VDOC interests in cost-efficient, uniform procedures by which to accommodate inmates' religious dietary beliefs properly at numerous facilities in the VDOC system"); *cf. Baranowski*, 486 F.3d at 125 (citation omitted) (finding policy refusing to provide inmate with individualized diet "is related to maintaining good order and controlling costs and, as such, involves compelling governmental interests"); *Wortham v. Lantz*, No. 3:10–cv–1127 (DJS), 2014 WL 4073201, at * 4 (D. Conn. Aug. 13, 2014) (citation omitted) (internal quotation marks omitted) (explaining that Connecticut's requirement "for inmates to utilize the Common Fare menu and not providing them with halal meat did not violate . . . RLUIPA, since that requirement was in furtherance of compelling governmental interests including prison security, controlling costs and maintaining workable administrative procedures").

Providing individualized menus to different religions and serving inmates their meals at varying times would be both cost-prohibitive and labor-prohibitive. (Findings of Fact ¶¶ 32–34); *cf. Heard v. Caruso*, No. 2:05–cv–231, 2012 WL 951698, at *3–5 (W.D. Mich. Mar. 20, 2012) ("[G]iven the length of the prohibited list of foods" in *How To Eat To Live*, "significant additional food costs would be attendant to attempt to provide nutritious food consistent with the NOI diet and also provide for the dietary needs of all other prisoners in the system."). Providing an individualized NOI menu would impose extensive administrative and food costs, require the purchase of new kitchen equipment, require new construction to accommodate food storage and

preparation, require more staff, and require longer dining hall times and longer work hours for kitchen staff, including inmate workers. (Finding of Fact ¶ 34); *cf. Cutter*, 544 U.S. at 726 ("Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.")

The VDOC purchases and cooks food for the Common Fare Program in bulk, and the fruits and vegetables served are based on seasonal availability. (Finding of Fact ¶ 34.) Fresh produce has a limited shelf life. (*Id.*) Thus, many of the fresh vegetables Plaintiffs claim they may eat (e.g., cooked cabbage without green leaves, spinach, carrots, cauliflower, rhubarb, eggplant, asparagus, beets, and broccoli) would not be readily available year round. There would also be an increase in wasted food, as many inmates would not eat these vegetables, increasing both costs and waste. Accommodating individualized religious diets would also increase security concerns by requiring greater offender movement within the institution for meals and disrupting the schedules that support security concerns. (Finding of Fact ¶ 35.)

The VDOC could not place all NOI adherents, currently about 1400[9] inmates, into one facility because it would interfere with both security concerns and the mission to support a successful reentry. There are various security levels among those adherents, necessitating different security restrictions. Further, inmates are moved to facilities nearer their homes when they are close to release in order to facilitate the transition back into the community. (Finding of Fact ¶ 37.)

In addition, the VDOC has a compelling interest in uniformity in the manner it treats religious groups and must avoid providing individualized diets for some religious groups but not

---

[9] Plaintiffs dispute that there are this many NOI adherents with sincerely held beliefs, but it would be a difficult and time-consuming process to question each NOI adherent's beliefs and make such a determination.

others.  The impact of special individualized treatment for certain religious groups "could result in the perception that certain inmates are favored over others, which would have an adverse impact on prison morale." *Baranowski*, 486 F.3d at 122 (citation omitted).  Such individualized treatment would spawn "increased demand by other religious groups for similar diets." *Id.* at 125; *see supra* Finding of Fact ¶ 36.  It likely would also spawn equal protection claims under the Fourteenth Amendment if adherents to one religion were provided an individualized diet but adherents to other religions were not. *Baranowski*, 486 F.3d at 122–23.

Moreover, provision of the Common Fare Program furthers the compelling state interest of maintaining inmate health.  "It is well-established that inmates must be provided with nutritionally adequate food, prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume[] it." *Muhammad*, 2015 WL 300363, at *2 (quoting *Shrader v. White*, 761 F.2d 975, 986 (4th Cir. 1985)).  The VDOC nutritionists developed the Common Fare Menu to provide inmates who require certain religious diets with adequate and balanced nutrition.  (Findings of Fact ¶¶ 19, 23, 31.)  The diet set forth in *How to Eat to Live* would be comprised predominantly of vegetables and fruits in large quantities, and such a diet lacks valuable sources of nutrients that are provided by the Common Fare Menu.  (Finding of Fact ¶ 38.)  At least one court noted that a nutritional analysis of the NOI diet based on *How To Eat To Live* demonstrated that the diet was "nutritionally inadequate with regard to calories, thiamine, riboflavin, niacin, vitamin B6, vitamin B12, pantothenic acid, vitamin D, calcium, iron, magnesium, phosphorous, and potassium." *Tatum v. Meisner*, No. 13-cv-44-WMC, 2016 WL 323682, at *5 (W.D. Wisc. Jan. 26, 2016).  Eating the 2500 to 2600 calories a day required to sustain inmate health by consuming primarily a large quantity of vegetables and fruits and served as one meal per day would place inmates at risk for

29

health problems. *Cf. Heard*, 2012 WL 951698, at *3–5 (finding "consumption of 2900 calories at one meal was violative of nutritional norms and therefore in violation of [the department of corrections] policy to provide adequate sustenance for prisoners" and potentially in violation of the Eighth Amendment).[10] Thus, the alternative of delivering a single NOI meal once a day is not a feasible alternative. (Finding of Fact ¶ 38.)

In sum, requiring the VDOC to specially accommodate "NOI adherents and every one of the other . . . religious sects in the [VDOC] would create undue burdens on the prison administration," and the Common Fare Program "represents the least restrictive means available for handling religious dietary issues." *Jones*, 352 F. App'x at 916 (finding policy that offered standardized pork alternatives to all inmates requiring religious diet, including NOI adherents, furthered compelling state interests by the least restrictive means (citing *Baranowski*, 486 F.3d at 122)); *see Muhammad*, 2015 WL 300363, at *3 n.4 (holding Common Fare diet is the least restrictive means for provision of religious diets to inmates); *DePaola*, 2014 WL 3956108, at *4 (same); *Wortham*, 2014 WL 4073201, at *4 (granting summary judgment for defendants on RLUIPA challenge, in light of evidence "that an attempt to accommodate the plaintiff's dietary requests would involve significant costs and present serious security and administrative problems").

To the extent that Plaintiffs claim that the provision of the NOI Month of Fasting menu during Ramadan supports their position that such meals could be made available year round by the VDOC, the evidence demonstrates otherwise. It is very difficult to provide this menu during Ramadan, but the VDOC manages to do so since it is only for a thirty-day period and the meals are served outside of the normal food serving times. (Finding of Fact ¶ 33.) Even for such a

---

[10] Plaintiff Al-Azim contends that he eats only one meal per day, but the commissary records indicate that he supplements his diet with additional food items. When those additional items are consumed and the quantities of those items are unknown.

short period, there are substantial additional food and staffing costs. No evidence was presented that, beyond this once yearly departure for Ramadan, there is "any less burdensome alternative to a single, centralized common fare program that would accomplish the legitimate goal of uniform accommodation of inmates' religious dietary needs." *DePaola*, 2014 WL 3956108, at *4.

The uncontroverted evidence demonstrates that Defendants' provision of the Common Fare Menu, along with the Standard Menu, furthers compelling government interests by the least restrictive means. Accordingly, it is RECOMMENDED that Claim 1(b) be DISMISSED.

### C. Free Exercise

Similar to RLUIPA, in order for Plaintiffs to prevail on their First Amendment claim, they must demonstrate that Defendants' conduct substantially burdens their religious exercise. *Whitehouse v. Johnson*, No. 1:10cv1175 (CMH/JFA), 2011 WL 5843622, at *5 (E.D. Va. Nov. 18, 2011). "RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States." *Id.* at *5 (citing *Lovelace*, 472 F.3d at 186). Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van Wyhe v. Reisch*, 581 F.3d 639, 657–58 (8th Cir. 2009) (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)). As explained above, Plaintiffs have failed to demonstrate a substantial burden on their religious exercise. Accordingly, it is RECOMMENDED that Claim 1(a) be DISMISSED.

### VI. Conclusion

For the foregoing reasons, it is hereby RECOMMENDED that the Court DISMISS Claims 1(a) and 1(b) and DISMISS this action WITH PREJUDICE.

31

Plaintiffs are ADVISED that they may file specific written objections to the Report and Recommendation within fourteen (14) days of the date of entry hereof. Each objection should be labeled with the corresponding heading from the Report and Recommendation, should be numbered, and should identify with specificity the legal or factual deficiencies of the Magistrate Judge's findings. Failure to file specific objections in a timely manner to the Report and Recommendation may result in the entry of an Order denying the motion. *See* Fed. R. Civ. P. 72(b). It may also preclude further review or appeal from such judgment. *See Wright v. Collins*, 766 F.2d 841, 845 (4th Cir. 1985) (noting the general rule that "a party who fails to object to a magistrate's report is barred from appealing the judgment of a district court adopting the magistrate's findings").

Let the Clerk send a copy of the Report and Recommendation to Plaintiffs, counsel of record, and the Honorable James R. Spencer.

It is so ORDERED.


Richmond, Virginia
Date: March **3** , 2017

/s/
Roderick C. Young
United States Magistrate Judge

32